[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-12893
_____

Agency No. A200-615-726


SALIPAN GAKSAKUMAN,

                                                          Petitioner,

versus


U.S. ATTORNEY GENERAL,

                                                          Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(September 18, 2014)

Before WILSON, WILLIAM PRYOR and ROSENBAUM, Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

In this petition for review, we consider whether silence in a report of the

Department of State about torture of asylum seekers on return to an alien's home

country may rebut affirmative evidence of that torture presented by the alien.

Salipan Gaksakuman, an alien seeking asylum, withholding of removal, and relief under the Convention Against Torture, asks us to review not only his most recent order of removal, but also an earlier order. Because we conclude that the earlier order entered by the Board was final, that Gaksakuman declined to pursue a timely petition for its review, and that Gaksakuman, in his second appeal to the Board, failed to exhaust his earlier arguments, we hold that we lack jurisdiction to review the earlier order. We instead review only the most recent order, in which the Board denied Gaksakuman relief because it found he failed to establish that he would suffer persecution as a "failed asylum seeker" if returned to Sri Lanka. Gaksakuman presented evidence that Sri Lanka detains and tortures failed asylum seekers. But the Board ruled that this evidence was insufficient because the Country Reports on Human Rights issued by the Department of State were silent about the torture of failed asylum seekers in Sri Lanka. Because we conclude that the silence of a State Department report cannot, without more, rebut the affirmative evidence Gaksakuman presented, we vacate the Board's order and remand for further proceedings.

## I.  BACKGROUND

Salipan Gaksakuman is a native of Sri Lanka. Gaksakuman asserts that he is a Hindu priest of Tamil ethnicity. He alleges that beginning in 2009 he suffered various threats, beatings, extortion, and persecution at the hands of the Eelam

2

People's Democratic Party and the Sri Lankan army. Gaksakuman's father eventually sent his son out of the country to escape the violence by allegedly bribing officials to secure his son's exit.

In December 2010, Gaksakuman arrived in Miami, Florida, where the Department of Homeland Security ordered him removed because he was present in the United States without having been admitted or paroled. 8 U.S.C. §1182(a)(6)(A)(i). Gaksakuman conceded his removability, but filed an application for asylum, 8 U.S.C. § 1158, for withholding of removal, 8 C.F.R. § 208.16(b), and for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 8 C.F.R. § 208.16(c).

At the hearing before an immigration judge, Gaksakuman argued that as a Tamil, the Eelam People's Democratic Party and the Sri Lankan army, which targeted Tamil families, threatened him with persecution. The immigration judge refused to credit Gaksakuman's testimony about his fear of future persecution and ruled that he had failed to establish that he would suffer persecution based on his Tamil ethnicity.

Gaksakuman appealed to the Board of Immigration Appeals. The Board deferred to the findings of the immigration judge and dismissed the appeal in May 2012. Gaksakuman then filed a timely petition in our Court to review the order of

3

the Board. But Gaksakuman later filed a motion to dismiss that petition before our Court, which we granted.

Before he moved to dismiss his petition in our Court, Gaksakuman also filed an untimely petition to reopen his case with the Board. In his motion to reopen, Gaksakuman did not renew his earlier arguments, but instead argued that the immigration judge and the Board failed to address his argument that he would be persecuted upon his return to Sri Lanka based on his status as a "failed asylum seeker." Gaksakuman submitted new evidence to support this claim. The Board described Gaksakuman's motion as "in the nature of a motion seeking reconsideration" and *sua sponte* granted the motion. The Board remanded the record to the immigration judge to consider Gaksakuman's new argument and the evidence that he submitted to support it.

On remand, the immigration judge considered Gaksakuman's evidence tending to prove that torture was a possibility for returning, failed asylum seekers. A report by the United Kingdom Border Agency collected sources indicating that torture and arbitrary detainment are rampant in Sri Lanka. The report indicated that there was a "persistent pattern of torture," including against those individuals perceived to associate with a group called the Liberation Tigers of Tamil Ealam. "Those at particular risk of torture include Tamils who have an actual or perceived association with the Liberation Tigers." Fourteen cases of torture were reported by

4

those who had traveled abroad prior to their detainment, including five who had traveled for education, three who had traveled for family reasons, and four who had sought refuge outside of Sri Lanka. A news article reported that a court in Britain had ordered a deportation of Tamils halted due to concerns they would be tortured on their return.

A Human Rights Watch news release reported that some failed Tamil asylum seekers were subjected to arbitrary arrest and torture upon their return, particularly if they were associated with the Liberation Tigers. An Amnesty International report stated that the Sri Lankan government had a "history of arresting and detaining rejected Sri Lankan asylum seekers upon their return and [the organization was] aware of cases of people being tortured." A report by Freedom from Torture stated that "Sri Lankan Tamils who in the past had an actual or perceived association *at any level* with the [Liberation Tigers] but were able to leave Sri Lanka safely now face risk of torture on return."

Gaksakuman also presented a news report tending to prove that, regardless of any *actual* affiliation with the Liberation Tigers, Sri Lankan officials detained and tortured failed asylum seekers as presumed traitors. An official of the Catholic Church's Edmund Rice Centre was quoted as saying, "The difficulty here is that there is a view in Sri Lanka that anybody who left the country through an unauthorised manner, of unauthorised means . . . must therefore be [a] traitor[]."

5

The official stated that, in the eyes of the Sri Lankan government, all who fled are "branded" as sympathizers of the Liberation Tigers, and "consequently sending them back is sending them back into danger." The Centre found that of the 11 people removed to Sri Lanka from Australia, all of them had been arrested at the airport. Some were "bashed [and] assaulted," and some had permanent damage to hearing or eyesight. If they are "Sinhalese people who left," the "assumption" was that they were Liberation Tiger sympathizers and traitors.

Gaksakuman's evidence failed to persuade the immigration judge. The immigration judge stated that, although Gaksakuman had "submitted documents . . . that suggest[ed] that failed Asylum seekers are being tortured in Sri Lanka, . . . the [Department of State] Human Rights Reports [did] not mention[] failed Asylum seekers being tortured." The immigration judge ruled that the silence of the State Department reports rebutted Gaksakuman's evidence, and the immigration judge denied Gaksakuman's application. Gaksakuman appealed to the Board for review, but the Board adopted the order of the immigration judge and dismissed the appeal.

Gaksakuman then timely filed another petition for review in our Court. Gaksakuman also filed an emergency motion for a stay of removal, which we granted. Gaksakuman's petition asks us to review not only the 2013 order denying

relief, but also the arguments the Board rejected in its 2012 order affirming the immigration judge's first order of removal.

## II.  STANDARD OF REVIEW

We review questions concerning our jurisdiction *de novo*. *Ortega v. U.S. Att'y Gen.,* 416 F.3d 1348, 1350 (11th Cir. 2005). We are limited to reviewing "final order[s] of removal," that have been timely filed. *Balogun v. U.S. Att'y Gen.,* 304 F.3d 1303, 1307 (11th Cir. 2002); 8 U.S.C. § 1252(b)(1). We must affirm the order of the agency if it has "given reasoned consideration" to the application, "and made adequate findings." *Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1374 (11th Cir. 2006) (internal quotation marks omitted). When the Board fails to give "reasoned consideration" or to make "adequate findings," we remand for further proceedings because we are "unable to review" the evidence in the first instance. *Mezvrishvili v. U.S. Att'y Gen.*, 467 F.3d 1292, 1295 (11th Cir. 2006) (quoting *Tan*, 446 F.3d at 1377). We review the order of the Board only, but if it expressly adopts the reasoning of the immigration judge, we will review that order as well. *Id.*

## III. DISCUSSION

Our discussion proceeds in two parts. First, we explain that we lack jurisdiction to review the 2012 order of the Board. Second, we explain that in its 2013 order the Board failed to give reasoned consideration to Gaksakuman's application.

7

### A. *We Lack Jurisdiction to Review the 2012 Order of the Board.*

Neither party raised the issue of jurisdiction in its briefing, but it is "well settled that a federal court is obligated to inquire into [its] subject matter jurisdiction *sua sponte*." *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999). In this petition, Gaksakuman asks us to review both the 2012 and 2013 orders of removal. There is no question as to our jurisdiction over the 2013 order, but to seek judicial review of the 2012 order, Gaksakuman must have filed a petition with our Court within 30 days of the issuance of that order. 8 U.S.C. § 1252(b)(1). Gaksakuman did so here, but then moved to dismiss his petition to our Court, which we granted. The 30-day window has now long since passed. Gaksakuman's counsel contended at oral argument that "when the case was reopened [by the Board] there was no final order," and we may review all of his arguments, but we disagree.

As an initial matter, there is some question as to what the Board actually granted after Gaksakuman moved to reopen the proceedings. The Board repeatedly called its order a grant of a motion for reconsideration. But the Board remanded the record to the immigration judge to consider Gaksakuman's new argument and evidence that he would suffer persecution as a failed asylum seeker. This remand tracks the ordinary procedure for a reopening. 8 C.F.R. § 1003.2(i). Nevertheless,

8

whether the Board ordered a reopening or a reconsideration, we lack jurisdiction over the 2012 order.

If the 2013 order was the result of a reconsideration, our precedent holds that the 2012 order remains a final order and we lack jurisdiction to review it. In *Jaggernauth v. United States Attorney General*, we decided that an order resulting from a motion to reconsider does not, lacking more, vacate or render the original order non-final. 432 F.3d 1346 (11th Cir. 2005). In *Jaggernauth*, the petitioner filed a timely petition in our Court for review of a final order of removal by the Board. *Id*. at 1348–49. The petitioner continued to prosecute that petition, but also moved the Board to reconsider its order of removal. *Id.* The Board granted the motion and again ordered the petitioner's removal. *Id*. at 1349–50. Then in our Court, the Attorney General moved to dismiss the petition to review the first order on the ground it was no longer final because the Board had implicitly vacated it when the Board granted reconsideration. *Id.* at 1348. We disagreed. "We do not believe the [Board] intended its second order to . . . change the substance of the original order. The [order on reconsideration] explicitly upholds the [original order], . . . suggesting the [Board's] intent was to leave the [original] order, as well as the reasoning underlying the order, intact and unmodified." *Id.* at 1351. Accordingly we held that we retained jurisdiction over the first order because it remained final. *Id.* at 1352. Likewise, the 2013 order of removal in Gaksakuman's

9

petition did not modify or alter the 2012 order in any way. The Board initiated the additional proceeding solely to determine the merits of Gaksakuman's *new* argument, based on his status as a failed asylum seeker. The Board left the 2012 order "intact and unmodified." *Id.* at 1351. So if the Board granted a motion to reconsider, *Jaggernauth* forecloses our review of the earlier order.

If the Board instead reopened the proceeding, we still lack jurisdiction because Gaksakuman did not renew his original arguments in his motion to reopen. The Board granted Gaksakuman's motion only to allow consideration of his new argument that he would be subject to persecution as a "failed asylum seeker" on return to Sri Lanka. And the immigration judge considered only that new argument. On appeal from the order denying Gaksakuman's application, the Board ruled on only his new argument. To be sure, during that appeal to the Board, *after* the immigration judge had rejected Gaksakuman's new argument, Gaksakuman attempted to challenge parts of the 2012 order in his briefing. But that attempt came too late. Gaksakuman failed to exhaust the arguments he now seeks to raise and we lack jurisdiction to consider them. *See* 8 U.S.C. 1252(d)(1) ("A court may review a final order of removal only if . . . the alien has exhausted all administrative remedies available."); *see also Amaya-Artunduaga v. U.S. Atty. Gen.*, 463 F.3d 1247, 1250-51 (11th Cir. 2006) (explaining that appeals court lacks jurisdiction to consider an argument not raised before the Board).

10

*B. The Board Failed to Give Reasoned Consideration to Gaksakuman's Argument That He Would Suffer Persecution as a Failed Asylum Seeker.*

Gaksakuman argues that the Board erred when it denied his application for asylum, withholding of removal, and relief under the Convention based on his membership in the social group of "failed asylum seekers." The Immigration Clinic of the University of Miami School of Law, as *amicus curiae*, argues too that the Board failed to give Gaksakuman's application reasoned consideration. The Board adopted the reasoning of the immigration judge's order on reconsideration, so we review both orders. *Al Najjar v. Ashcroft,* 257 F.3d 1262, 1284 (11th Cir. 2001).

We agree with Gaksakuman and the persuasive brief of the *amicus curiae* that the Board failed to give "reasoned consideration" to Gaksakuman's application. *Mezvrishvili*, 467 F.3d at 1295 (quoting *Tan*, 446 F.3d at 1375). The Board adopted the reasoning that the absence of evidence in reports of the State Department somehow rebutted Gaksakuman's evidence of torture. That logic is flawed.

Gaksakuman submitted evidence in support of his allegation that, as a "failed asylum seeker," he would be subject to torture upon his return to Sri Lanka. The immigration judge found most of the evidence credible, including reports from non-profit organizations and newspapers. The evidence tended to prove that officials in Sri Lanka tortured at least some failed asylum seekers, particularly if

11

they had an actual or perceived association with the Liberation Tigers. A report by the United Kingdom Border Agency established that failed asylum seekers returning to Sri Lanka are subject to torture where officials believe the returnee has ties to the Liberation Tigers. A Human Rights Watch news release reported that some failed Tamil asylum seekers were subjected to arbitrary arrest and torture upon their return, particularly if they were associated with the Liberation Tigers. An Amnesty International report stated that the Sri Lankan government had a "history of arresting and detaining rejected Sri Lankan asylum seekers upon their return and [the organization was] aware of cases of people being tortured."

Gaksakuman also presented evidence tending to prove that there was a risk of detainment and torture regardless of whether the failed asylum seeker was *actually* a Tamil with ties to the Liberation Tigers. An official of the Catholic Church's Edmund Rice Centre was quoted in one document as saying, "The difficulty here is that there is a view in Sri Lanka that anybody who left the country through an unauthorised manner, of unauthorised means . . . must therefore be [a] traitor[]." The official stated that, in the eyes of the Sri Lankan government, all who fled are branded as sympathizers of the Liberation Tigers, and "consequently sending them back is sending them back into danger." If the returnee was Sinhalese, the assumption was that they were a "traitor."

12

The immigration judge denied Gaksakuman's application based on the *silence* of State Department reports without discrediting the evidence that Gaksakuman presented or giving more weight to contrary evidence. The immigration judge explained that he was entitled to "rely heavily" on State Department reports and concluded that, "[a]lthough [Gaksakuman] has submitted documents and supporting materials that suggest that failed Asylum seekers are being tortured in Sri Lanka," the silence of the State Department reports "negates his claim." We have recognized that an immigration judge is "entitled to rely heavily on" State Department reports, *Reyes–Sanchez v. U.S. Att'y Gen.,* 369 F.3d 1239, 1243 (11th Cir. 2004), but those reports are reliable only to the extent they "comment upon or are relevant to the highly specific question[s]" raised by an alien, *Tang v. U.S. Att'y Gen.*, 578 F.3d 1270, 1280 (11th Cir. 2009) (internal quotation marks omitted).

State Department reports cannot rebut an applicant's evidence when those reports do *not* "comment upon" the individual's application. State Department reports do not purport to be exhaustive, and the 2011 report states in its introduction that it "do[es] not attempt to catalog every incidence, however egregious, of a particular type of human rights abuse in a country." And if anything, the reports in this record corroborate Gaksakuman's arguments. The reports state that the Sri Lankan government and its agents commit "arbitrary and

13

unlawful killings, . . . torture[] and abuse[ of] detainees, . . . and arbitrar[y] arrest[s]." The government of Sri Lanka "continue[s] to search for and detain persons it suspected of being [Liberation Tigers] sympathizers." The government "infringed on . . . rights[] particularly when conducting . . . operations in Tamil neighborhoods," and a "disproportionate number of victims of human rights violations were Tamils."

The Board added little to the reasoning of the immigration judge, except that it found Gaksakuman had not established he was a member of the group "failed asylum seekers" because he failed to establish he was a "Tamil[] who had an actual or perceived association with the Liberation Tigers." But Gaksakuman's status as a Tamil was never questioned by the immigration judge. And even if Gaksakuman failed to prove actual association with the Liberation Tigers, his evidence tended to prove that any Sinhalese who sought asylum would be perceived as affiliated with the Liberation Tigers regardless of actual association. For instance, the official of the Edmund Rice Center stated, "[W]hile [Australia's Federal Government] is wise to urge caution in returning asylum seekers connected to the [Liberation Tigers], in the eyes of the Sri Lankan government all those who fled are branded the same way. . . . [I]f they are Sinhalese people who left, then they must therefore be traitors."

14

We vacate the 2013 order. The Board failed to give "reasoned consideration" to Gaksakuman's application. We remand for further proceedings because we are "unable to review" the evidence in the first instance to determine whether Gaksakuman is likely to suffer torture if he returns to Sri Lanka as a failed asylum seeker. *Mezvrishvili*, 467 F.3d at 1295 (quoting *Tan*, 446 F.3d at 1375).

## IV. CONCLUSION

We **GRANT** the petition for review, **VACATE** the order of the Board, and **REMAND** for further proceedings.