[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-14486
Non-Argument Calendar

_____

Agency No. A094-570-601

THOMAS LENOR,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(March 5, 2020)

Before ED CARNES, Chief Judge, JILL PRYOR, and ANDERSON, Circuit
Judges.

PER CURIAM:

Thomas Lenor entered the United States as a refugee in 2004.  Soon after he was arrested for and convicted of petit theft.  After that, he continued to commit more crimes, including violent ones.  The Department of Homeland Security then sought to remove Lenor based on his extensive criminal conduct.  In time Lenor conceded removability but tried to avoid removal on other grounds.  He filed an application for a waiver of inadmissibility and an adjustment of status under 8 U.S.C. § 1159(a), (c), as well as an application for withholding of removal under 8 C.F.R. § 1208.16(c).  An Immigration Judge denied his applications.  The Board of Immigration Appeals then dismissed his appeal.  This is his petition for review of the Board's decision.

## I.

Lenor is a native and citizen of Sierra Leone.  He was admitted to the United States as a refugee in February 2004.  In 2010 the Department of Homeland Security issued Lenor a notice to appear and charged him as being removable under 8 U.S.C. § 1227(a)(2)(A)(iii) for having been convicted of an aggravated felony based on his Florida convictions for burglary of a dwelling, criminal mischief, burglary of a dwelling with an assault or a battery, robbery with a firearm, and third-degree grand theft of a motor vehicle.  The Department later charged Lenor with two additional grounds for removability in connection with his

2

Florida conviction for possession of cocaine.  He eventually conceded removability

for having been convicted of that offense.  See 8 U.S.C. § 1227(a)(2)(B)(i).

After receiving a notice to appear, Lenor filed an application for a waiver of

inadmissibility and an adjustment of status.  He is an inadmissible refugee because

of his criminal conduct and would require a waiver to adjust his status under

§ 1159(a).  His waiver application stated that his parents and brother were United

States citizens and that he would suffer exceptional and extremely unusual

hardship if removed to Sierra Leone given the poor country conditions, his "mental

health condition," and the lack of mental health care.

Lenor then filed a motion seeking permission to have expert witness Dr.

Ayana Jordan testify over the phone about the stigma surrounding mental illness

and the lack of mental health treatment in Sierra Leone.  Lenor stated that he was

indigent and could not afford to pay an expert witness, that the law clinic

representing him pro bono could not reimburse Dr. Jordan's travel expenses, and

that Dr. Jordan was providing her services pro bono and could not pay her own

travel expenses, so she needed to testify by phone.  The IJ denied the motion but

did consider a written statement submitted by Dr. Jordan.[1]

---

[1] Although a cover sheet and blank order form for this motion are included in the record, the completed order is not.  But the parties agree that the IJ denied the motion.

Lenor also applied for withholding of removal under the United Nations Convention Against Torture, 8 C.F.R. § 1208.16(c).  He stated that he was entitled to CAT relief because if he returned to Sierra Leone, he would be tortured and otherwise harmed by the government as well as by private individuals on account of his mental health condition.  He said it was likely he would be committed to Kissy Mental Hospital (a Sierra Leone mental health facility) and subjected to cruel and inhumane treatment amounting to torture, such as being chained to a bed for long periods of time.  He claimed that, when he was nine years old, government soldiers in Sierra Leone accused him of being a rebel, aimed an assault rifle at his head, and threatened to kill him.  And he said that he had witnessed people being killed, burned alive, or dismembered, and saw others committing suicide to avoid abuse.  He also stated that his family was threatened and mistreated.

The IJ held an individual merits hearing on Lenor's applications and set aside a time period of an hour and a half for the hearing.  During that hearing a law student representative conducted Lenor's direct examination and made the closing argument.  The IJ asked the law student representative twice if he was done with Lenor's direct, and he said yes both times.  He also declined to redirect Lenor when offered the opportunity.  Lenor's lead counsel conducted a direct examination of Tamara Fisher, a chaplain who was called as a witness for Lenor.

4

Lenor also entered several exhibits into the record, including affidavits from his mother, father, and brother, and one from his mental health expert, Dr. Jordan.

After the hearing the IJ issued a written opinion rejecting Lenor's applications and ordering him removed to Sierra Leone. The IJ's opinion denied Lenor's application for a waiver of inadmissibility. And because Lenor remained inadmissible, the IJ automatically denied his application for an adjustment of status. The IJ also denied his application for CAT relief, determining that he had not established that it was more likely than not he would be tortured at the instigation of or with the consent or acquiescence of government officials if removed to Sierra Leone.

Lenor appealed the IJ's decision to the Board. He contended that the IJ erred (1) in not exercising his discretion to grant Lenor a § 1159(c) waiver of inadmissibility; (2) by finding that Lenor had not met his burden for CAT relief, despite the record demonstrating (a) that the government would acquiesce in his torture by private individuals and (b) that the poor conditions at Kissy Mental Hospital were created with the specific intent to torture patients; and (3) by depriving him of due process because of the IJ's conduct during the hearing. Lenor also moved to remand the case to the IJ for consideration of an Economist article submitted on appeal discussing the terrible state of Kissy Mental Hospital.

5

The Board rejected his contentions, dismissed his appeal, and denied his motion to remand. Lenor then petitioned us for review.[2]

## II.

This court's jurisdiction to review the Board's decision is limited. We have jurisdiction to review only colorable constitutional or legal claims. 8 U.S.C. § 1252(a)(2)(D); Arias v. U.S. Att'y Gen., 482 F.3d 1281, 1283 (11th Cir. 2007). We generally lack jurisdiction to review a final order of removal against an alien who is removable for having committed certain crimes (including controlled substance offenses), a discretionary decision of the Attorney General or the Secretary of Homeland Security (including a decision to grant or deny a § 1159(c) waiver), and any factual determinations made by the Board or IJ. Cole v. U.S. Att'y Gen., 712 F.3d 517, 523–24, 532–33 (11th Cir. 2013); Makir-Marwil v. U.S. Att'y Gen., 681 F.3d 1227, 1234 n.4 (11th Cir. 2012). We lack jurisdiction to consider meritless constitutional or legal claims and "abuse of discretion claims merely couched in constitutional language." Arias, 482 F.3d at 1284.

When reviewing colorable constitutional or legal claims, we do so under a de novo standard of review. Id. at 1283. We review the Board's decision, unless and to the extent the Board expressly adopted the IJ's decision. Perez-Zenteno v. U.S. Att'y Gen., 913 F.3d 1301, 1306 (11th Cir. 2019). Where the Board agrees

---

[2] This Court granted Lenor's motion for a stay of removal pending review of his petition.

6

with the IJ's decision and then adds its own observations, we will review the decisions of both the Board and the IJ.  Id.

### III.

Lenor makes four contentions in his petition:  (1) the Board erred in concluding that the IJ did not violate his due process rights by limiting testimony and demonstrating hostility against Lenor; (2) the Board erred in denying his application for CAT relief; (3) the Board misapplied the law in denying his motion to remand to introduce new evidence; and (4) the Board applied the wrong legal standard and failed to consider all relevant factors in affirming the IJ's denial of his application for a waiver of inadmissibility.

### A.

Lenor contends that the IJ who conducted his individual hearing violated his due process rights.  First, he alleges that the IJ engaged in bullying and hostile conduct by doing things such as repeatedly interrupting Lenor's counsel (but not counsel for the government) and by treating his law student representatives poorly. Second, he argues that the IJ wrongly refused to allow Dr. Jordan to testify by phone and certain members of his family to testify in person.

The Due Process Clause requires that aliens be given notice, an opportunity to be heard, and a full and fair hearing.  Tang v. U.S. Att'y Gen., 578 F.3d 1270, 1275 (11th Cir. 2011).  To establish a due process violation, an alien must show

7

both that he was deprived of liberty without due process and that this deprivation caused him substantial prejudice.  Id.  To show substantial prejudice, the alien must demonstrate that, absent the alleged violations, the outcome of the proceeding would have been different.  Alhuay v. U.S. Att'y Gen., 661 F.3d 534, 548 (11th Cir. 2011).

Lenor cannot show that a due process violation occurred.  Even assuming that he suffered a deprivation of liberty because of the IJ's conduct (and we are not holding that he did), his due process claims still fail because he has not demonstrated that he was substantially prejudiced.  There is no evidence that the IJ's interruptions, remarks, and other actions prejudiced him; Lenor does not point to any evidence that he was prohibited from entering into the record that would have changed the outcome.  Nor was he substantially prejudiced by the exclusion of his expert witness' telephonic testimony or his family members' live testimony, given that he provided, and the IJ considered, written statements from those witnesses.  In his opinion the IJ repeatedly referenced Dr. Jordan's affidavit.  For those reasons, we deny Lenor's petition as to his due process claims.[3]

B.

---

[3] Lenor properly exhausted his due process claims by sufficiently raising them before the Board such that the Board could, and did, consider them.  Bing Quan Lin v. U.S. Att'y Gen., 881 F.3d 860, 866–68 (11th Cir. 2018).

Lenor contends that the Board erred in denying his application for CAT relief by rejecting his argument that if removed, given his mental health condition, he would likely be tortured either by unnamed members of the civilian population with the acquiescence of government officials or by public officials if detained at Kissy Mental Hospital.

An alien is entitled to CAT relief if he establishes that it is more likely than not that he will be tortured in the country of removal by public officials or by private individuals with public officials' acquiescence. Jean-Pierre v. U.S. Att'y Gen., 500 F.3d 1315, 1320, 1322–23 (11th Cir. 2007). For an act to constitute torture, "it must be: (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for an illicit or proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions." Id. at 1327.

We have clarified that a CAT relief claim must be separated into two inquiries — (1) the likelihood a foreign government would engage in a particular course of conduct, and (2) whether a particular undisputed or adjudicated fact pattern amounts to torture. Zhou Hua Zhu v. U.S. Att'y Gen., 703 F.3d 1303, 1311 (11th Cir. 2013).

Different standards of review apply to these distinct inquiries. The likelihood that a foreign government would engage in a particular course of conduct or acquiesce in it is an unreviewable factual finding. See Cole, 712 F.3d at 533. But the determination of whether a particular set of facts meets the definition of torture is a legal conclusion we review de novo. Id. at 534.

1.

Lenor argues that the Board erred in affirming the IJ's decision denying his CAT claim on the grounds that there was insufficient evidence that (1) Lenor would experience harm by private individuals rising to the level of torture or (2) that government officials would acquiesce in such conduct by private individuals.

Lenor asserts that the Board applied the incorrect standard of review (clear error instead of de novo) in concluding that the evidence indicated the harm inflicted by private individuals would not rise to the level of torture. And on the question of whether government officials would acquiesce, he asserts that the Board should have concluded that the IJ committed clear error in finding that the record contained insufficient evidence that the Sierre Leonean government would acquiesce in Lenor's torture by private individuals.

Even assuming that the Board erred by applying clear error instead of de novo review in reviewing the IJ's finding that private individuals would not inflict

10

torture on Lenor, his CAT claim still fails.[4]  That is because to succeed Lenor must show both that he would experience harm by private individuals rising to the level of torture and that government officials would acquiesce in such conduct.  And the likelihood of a future event — such as whether government officials will acquiesce regarding private individuals' conduct — is an unreviewable factual determination. See Zhou Hua Zhu, 703 F.3d at 1311 ("[W]hether [a] foreign government would engage in 'a particular course of conduct' [is] a factual issue, which [this court] could not review." (quoting Jean-Pierre, 500 F.3d at 1321)); see also Cole, 712 F.3d at 522, 533 (describing this question as a factual determination).

Because the Board's decision is sustainable "solely based on the IJ's factual finding that the" government of Sierra Leone will not acquiesce in Lenor's torture, we cannot review the BIA's decision on this issue and dismiss Lenor's petition as to this claim.  Cole, 712 F.3d at 533.

---

[4] The Board has discretion to "prescribe its own procedural rules," see Pinos-Gonzalez v. Mukasey, 519 F.3d 436, 440–41 (8th Cir. 2008) (citing 8 C.F.R. § 1003.1(d)(4)), including whether to review de novo questions of law, 8 C.F.R. 1003.1(3)(ii) ("The Board may review questions of law . . . de novo.") (emphasis added).  But the Board has stated that it reviews de novo legal determinations such as whether a pattern of facts constitutes torture.  See, e.g., Matter of Z-Z-O-, 26 I. & N. Dec. 586, 590–91 (2015); BIA Prac. Man. Ch. 1 (E.O.I.R., 1999 WL 33435426, § 1.4(c)(i)(B)).  And the Board's failure to adhere to its own procedures may be a legal error enforceable against the Board.  See Washington v. Comm'r, 906 F.3d 1353, 1361 (11th Cir. 2018) (holding that an agency's internal procedures are enforceable against the agency only "where failure to enforce such regulations would adversely affect substantive rights of individuals"); see also Pinos-Gonzales, 519 F.3d at 440–41.  But we need not, and do not, decide that question in this case.

11

2.

Lenor also contends that the Board erred by denying his CAT claim after concluding that public officials at Kissy Mental Hospital would not torture him. We have jurisdiction over the following legal question:  Are the poor conditions (including chaining up patients) at Kissy created or maintained for the purposes of torturing patients?  We review de novo this question and any component part of this question.[5]

Lenor argues that the bad conditions at Kissy are caused not by lack of resources but by public officials intending to inflict severe pain or suffering.  He asserts that the extreme stigma against mental illness is sufficient evidence of specific intent.  He says this stigma is what causes Sierra Leone to underfund Kissy.  He also argues that this stigma, not a lack of resources, is why patients are chained to their beds.

The Board concluded that there was insufficient evidence demonstrating that the poor conditions were caused by public officials' intent to torture.  The Board concluded that the deplorable conditions at Kissy were instead caused by a lack of resources.  Similarly, it held that the practice of chaining up or otherwise

_____

[5] Lenor did not argue that the Board applied the wrong standard of review to the question of whether the conditions at Kissy constitute torture.  He has thus waived any argument about that.  See Cont'l Tech. Servs., Inc. v. Rockwell Int'l Corp., 927 F.2d 1198, 1199 (11th Cir. 1991) ("An argument not made is waived . . . .").

12

restraining patients was not done to torture but to control patients and keep them from moving around, and that there was "not an intention to harm those afflicted with mental illness."

Even though the record shows that conditions at Kissy are terrible, they do not constitute torture for present purposes. The evidence establishes that the poor conditions at Kissy are caused by a lack of resources. Even if stigma related to mental illness causes Sierra Leone to spend less than it otherwise would on mental health care, the failure of a poor country to maintain a better mental health facility when it theoretically could spend more money is not torture. See Jean-Pierre, 500 F.3d at 1323–24 (citing Cadet v. Bulger, 377 F.3d 1173 (11th Cir. 2004)). And the evidence indicates that the practice of chaining patients is done to control them (especially agitated patients) instead of to inflict severe pain or suffering.

The Board thus properly denied Lenor CAT relief on his claim it was more likely than not that he would be tortured at Kissy Mental Hospital.

C.

Lenor contends that the Board committed legal error in denying his motion to remand his case to the IJ so that the IJ could consider in the first instance an Economist article about the conditions at Kissy Mental Hospital. The article was published weeks after the IJ's decision. Lenor argues that the article is new evidence that undermines the IJ's conclusion that the Sierra Leone government

13

lacked the specific intent to torture the mentally ill. Much of the article discusses the terrible state of the hospital. It also includes quotations from Dr. Abdul Jalloh, a psychiatrist and new "director" of Kissy. The IJ's opinion described him as someone trying to improve Kissy. The article portrays him in an unfavorable light.

Where a motion to remand seeks to introduce evidence that has not previously been presented, it should be treated as a motion to reopen under 8 C.F.R. § 1003.2(c) and subjected to the same substantive requirements. See Najjar v. Ashcroft, 257 F.3d 1262, 1301 (11th Cir. 2001).

A person filing a motion to reopen bears a heavy burden and must present evidence of such a nature that the Board is satisfied that, if proceedings before the IJ were reopened the new evidence offered would likely change the result in the case. Ali v. U.S. Att'y Gen., 443 F.3d 804, 813 (11th Cir. 2006). Motions to reopen are particularly disfavored. Zhang v. U.S. Att'y Gen., 572 F.3d 1316, 1319 (11th Cir. 2009). And the Board has broad discretion to grant or deny them. Najjar, 257 at 1302. But they may be granted if there is new evidence that is material, was not previously available, and could not have been discovered or presented at the removal hearing. See 8 C.F.R. §§ 1003.2(c)(1), 1003.23(b)(3). The Board must also give "reasoned consideration" in its ruling on the motion. See Gaksakuman v. U.S. Att'y Gen., 767 F.3d 1164, 1168 (11th Cir. 2014).

Our jurisdiction to review the Board's decision extends only to colorable legal issues. First, the Board correctly applied the relevant legal standard when ruling on Lenor's motion for a remand and specifically considered whether "the new evidence would likely change the result in the case given the lack of specific intent to torture, as set forth above." Second, the Board also gave adequate reasoned consideration to Lenor's motion. It considered the article Lenor submitted, acknowledged that it was new evidence, and noted that it contradicted some of the IJ's findings. And the Board gave a reasoned justification for denying the motion anyway — it would not likely change the result of the case given the lack of evidence in the record of a specific intent to torture mentally ill patients.

We thus deny the petition as to Lenor's motion to remand.

### D.

Lenor contends that the Board committed two legal errors in considering whether he should receive a § 1159(c) waiver of inadmissibility. First, he claims the Board failed to apply de novo review when considering the IJ's waiver denial, and instead improperly deferred to the IJ's decision. Second, he states that the Board failed to consider all the relevant factors when deciding whether to exercise discretion and grant the waiver. Specifically, he argues that because the Board erroneously concluded that Lenor failed to demonstrate that he would be tortured if

15

returned to Sierra Leone, the Board failed to consider the fact of this torture when weighing the positive and negative equities.

In evaluating an application for a waiver of inadmissibility, the IJ must first determine if a refugee is a violent or dangerous individual and, if so, the refugee must satisfy both the general statutory standard and a heightened "extraordinary circumstances" standard. Makir-Marwil, 681 F.3d at 1234 n.4. Lenor did not dispute before the Board the IJ's finding that he is a violent or dangerous individual, and he does not dispute it here. But even if a refugee is subject to the heightened standard for violent individuals, the IJ may waive inadmissibility if removal would result in exceptional and extremely unusual hardship. Id. at 1236. In this case the IJ found that Lenor would suffer exceptional and extremely unusual hardship if removed, but the IJ declined to exercise his discretion after weighing the equities because of Lenor's extensive criminal record and insufficient evidence of genuine rehabilitation.

We generally lack jurisdiction to review the discretionary denial of an application for a waiver of inadmissibility. Id. at 1234 n.4. We cannot reweigh the positive and negative equities, because whether Lenor was entitled to the waiver was a discretionary decision. Id. But we do retain jurisdiction to consider questions of law such as whether a material relevant factor should have been part of the analysis but was left out. See id. at 1236.

16

First, the Board did correctly conduct <u>de novo</u> review. The Board explicitly stated that "[u]pon de novo review" it was affirming the IJ's determination that Lenor did not merit a waiver. Lenor acknowledges this language but asserts that the Board's deferential language demonstrates it was actually conducting clear error review. But while the Board agreed with the IJ's decision, it went through all the positive and negative aspects of Lenor's case before reaching its own decision to affirm the IJ. The fact the Board agreed with the IJ's analysis does not convert its <u>de novo</u> review to clear error review.

Second, the Board's detailed analysis shows that it weighed all the material relevant factors. The Board discussed Lenor's long residence in the United States, his family ties, and the trauma he experienced. It also considered the challenges he would face upon returning to Sierra Leone, including the unique hardships he would suffer because of his mental health. And it considered rehabilitation potential. But after weighing the negative equities such as Lenor's extensive criminal history, it denied him a waiver. We cannot reweigh the equities. <u>See</u> <u>Arias</u>, 482 F.3d at 1284.

Because the Board conducted <u>de novo</u> review and weighed all the material relevant factors and given that we have concluded the Board did not otherwise commit legal error in denying Lenor's petition, we deny his petition on this issue.

**PETITION DISMISSED IN PART AND DENIED IN PART.**

17